IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

MARION RINKER,                        *
                                      *
          Plaintiff,                  *
                                      *
     v.                               *          CV 110-038
                                      *
                                      *
COLUMBIA COUNTY BOARD OF              *
EDUCATION; COLUMBIA COUNTY            *
SCHOOL SYSTEM; DEPARTMENT             *
OF TRANSPORTATION;                    *
Superintendent of Schools             *
CHARLES R. NAGLE; DEWAYNE             *
PORTER, Director of                   *
Transportation; Assistant             *
Superintendent ROBERT                 *
JARRELL, and CCBOE                    *
Chairman REGINA BUCCAFUSCO;           *
CCBOE Vice-Chairman MIKE              *
SLEEPER; CCBOE Member MILDRED         *
BLACKBURN; CCBOE Member WAYNE         *
BRIDGES; CCBOE Member ROXANNE         *
WHITAKER,                             *
                                      *
                                      *
          Defendants.                 *

## O R D E R

Presently before the Court is Defendants' Motion for Summary Judgment. (Doc. no. 32.) For the reasons set forth below, Defendants' motion is **GRANTED**.

## I. BACKGROUND

On a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor." United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Cntys., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted). In the present case, however, most of the operative facts are not in dispute. In fact, while Plaintiff "disputes" many of the facts set forth in Defendants' Statement of Undisputed Material Facts and Conclusions of Law, it appears that Plaintiff is not denying the actual facts but rather the implication of the facts. In other words, Plaintiff "disputes" the legal conclusions to be drawn from those facts as opposed to the accuracy of the facts as stated. Nevertheless, to the extent that there is a genuine issue of disputed *fact*, the Court has construed the facts in Plaintiff's favor.

### A. Factual Background

This case arises from Plaintiff's September 18, 2009 termination from her position as a special education bus driver for the Columbia County School District ("School District"). (Rinker Dep. at 21.) The School District hired Plaintiff in October of 1981 for an indefinite period of time. (Id. at 21,

2

22.)   During her time as a driver, Plaintiff worked without an employment contract.  (Id. at 22.)   Plaintiff joined the Transport Workers Union Local No. 279 shortly after its formation because she believed the union would provide assistance if she faced disciplinary problems.  (Id. at 18.)   Over the course of her employment, Plaintiff paid union dues and regularly attended union meetings.  (Id. at 19-20.)

In the years leading up to her termination, Plaintiff was twice accused of being unnecessarily rough with students.  (Porter Dep. at 36.)   Specifically, she was accused of slapping students on her route.  (Id.)   Dewayne Porter, Director of the Columbia County Transportation Department, met with Plaintiff to discuss these allegations, but never disciplined her because there was insufficient evidence to substantiate the claims.  (Id.)   Instead, Porter advised Plaintiff to be careful about her future interactions with students.  (Id. at 36-37.)

The incident that ultimately led to Plaintiff's termination occurred on August 24, 2009.   All parties agree that on the morning in question, Plaintiff and her bus aide, Betsy Ucman, transported special education student C.G. to River Ridge Elementary School ("River Ridge").   (Rinker Dep. at 26-27; Ucman Dep. at 16.)   C.G. has cerebral palsey, suffers from a profound intellectual disability, and is unable to walk independently. (Rinker Dep. at 28-29.)   When Plaintiff's bus arrived at River

3

Ridge, Ms. Bianca Caceres, the paraprofessional in C.G.'s classroom, stood at the classroom window to watch for students exiting the bus. (Caceres Dep. at 16-17.) Ms. Caceras stated that it was customary for her to watch as the buses arrived to ensure that she prepared breakfast for certain students. (Id. at 17.) While looking out the window, Ms. Caceres observed C.G. having some difficulty exiting the bus, and, as a result, she informed Ms. Alexis Reddock, C.G.'s classroom teacher, of the problem. (Reddock Dep. at 20.) Ms. Reddock positioned herself so that she could see Plaintiff's bus clearly through the classroom window. (Id. at 17.) After C.G. exited the bus, he walked to the sidewalk and sat down, refusing to stand. (Id. at 21.) Ms. Ucman and Plaintiff attempted to lift C.G. up off the sidewalk. (Id.) Plaintiff asked Ms. Ucman to go into the school and obtain assistance from C.G.'s classroom staff. (Rinker Dep. at 33, 45, 48.) After Ms. Ucman walked into the school, Plaintiff made further attempts to get C.G. to stand, but was unsuccessful. (Caceras Dep. at 19.)

The subsequent events are largely disputed by the parties. According to Defendants, Ms. Reddock and Ms. Caceras observed Plaintiff strike C.G. after he refused to stand. Ms. Reddock and Ms. Caceras stated that Plaintiff used her right hand to violently slap C.G. on the back of the head. (Reddock Dep. at 21-22; Caceres Dep. at 19.) According to the teachers, the force of the

4

blow was sufficient to propel C.G.'s head forward, and down toward his chest. (Id.) Ms. Reddock and Ms. Caceres claim that they immediately ran to assist C.G., who appeared visibly shaken from the alleged assault. (Reddock Dep. at 22; Caceres Dep. at 21, 24.) Both Ms. Reddock and Ms. Caceras observed scratch marks on C.G.'s arms. (Reddock Dep. at 22-23; Caceras Dep. at 24-25.) They took C.G. to the school nurse, and then to the school principal's office, where they informed principal Revelle Cox of the alleged assault. (Reddock Dep. at 23.)

Plaintiff, however, denies these allegations and claims that during the course of her employment she never struck a student. (Jordan Dep. at 32-33; 59.) She claims the only physical contact she had with C.G. on the morning in question involved holding his hand and standing behind him in an effort to lift him up off the ground. (Id. at 33.)

Porter, Plaintiff's immediate supervisor, was contacted regarding the incident. (Porter Dep. at 40-41; 53-55; 56-78.) Porter requested that Plaintiff come to his office, but did not initially inform Plaintiff as to why he wished to speak with her. (Rinker Dep. at 34.) When Plaintiff arrived she stated, "I didn't hit nobody." (Rinker Dep. at 89-91; Porter Dep. at 95.) Porter thought Plaintiff's statement was odd considering he had not spoken with her about the subject matter of the meeting. (Porter Dep. at 95.) Plaintiff, however, claims that her statement was

not out of the ordinary as she believed she was meeting with Porter to discuss a possible bus accident, and she knew that she did not strike another bus during her route. (Rinker Dep. at 90.) During this meeting, Porter advised Plaintiff of the report he received from River Ridge, and discussed the allegations included within the report. (Id. at 465.)

Porter subsequently conducted an investigation into the allegations. (Id.) He went to River Ridge and interviewed both Ms. Reddock and Ms. Caceras, obtaining written statements from both. (Id. at 55, 72-75.) He examined the classroom to ensure that they would have been able to clearly observe Plaintiff strike C.G. from their vantage point. (Id. at 53-55.) He found the witnesses to be credible because "they were very adamant in what they saw." (Id. at 470.)

Porter also interviewed Karlene Sylvester, another paraprofessional who was in the parking lot at the time of the incident, and Ms. Ucman. (Id. at 89; 92.) Ms. Sylvester stated that she could not verify whether the allegations against Plaintiff were true. (Id. at 44.) According to Ms. Sylvester, she was sitting in her parked car with a clear view of the sidewalk at the time of the incident. (Sylvester Dep. at 13.) She witnessed C.G. sitting on the ground and Ms. Ucman attempting to coax him into the school. (Id.) She claims that Ms. Ucman tried to pull C.G. up by his arms, but her efforts failed. (Id.

6

at 15.)   After Ms. Ucman walked inside, Plaintiff stood in front
of C.G. and tried to lift him up by his arms.   (Id. at 17.)   Ms.
Sylvester claims that she never saw Plaintiff strike C.G.,
although she admits that in an effort to exit her car she may have
looked away for a minute or two.   (Id. at 19.)

Ms. Ucman, like Ms. Sylvester, stated that she did not
observe Plaintiff strike C.G.   She claims that she and Plaintiff
attempted to coax C.G. into standing up.   (Ucman Dep. at 21.)
After their efforts failed, Ms. Ucman decided to get C.G.'s
teachers to assist them.   (Id. at 22.)   She asserts that when she
turned to go inside, the teachers were already at the front door.
(Id.)   According to Ms. Ucman, the teachers told C.G. that he
needed to stand up and go inside to his classroom.   (Id.)   Ms.
Ucman explained that she never witnessed Plaintiff strike C.G.
(Id.)

Porter scheduled a second conference with Plaintiff and
informed her that he was recommending her termination.   (Rinker
Dep. at 41.)   He advised Plaintiff of her right to have the
recommendation reviewed by Robert Jarrell, Assistant
Superintendent for the Columbia County School District.   (Id. at
43.)   Plaintiff subsequently met with Jarrell and explained that
she did not strike the student.   (Id. at 44.)   Jarrell reviewed
the witness statements and spoke to Ms. Caceras and Ms. Reddock by
phone in order to verify that their line of sight was not

7

obstructed during the incident. (Jarrell Dep. at 66.) Jarrell, however, did not meet with Ms. Ucman personally, but instead reviewed Porter's notes regarding her statement. (Id. at 69.) Jarrell believed that Ms. Ucman's statement conflicted with Plaintiff's statement. (Id. at 71.) While Ms. Ucman testified that she never made it inside the school because the teachers reached the door at the time she turned to go inside, Plaintiff stated that she sent Ms. Ucman into the building to get help and that when she looked toward the door, she did not see anyone standing nearby. (Id.) Jarrell stated that he upheld Porter's termination recommendation because it is unacceptable for any School District employee to intentionally strike a student. (Id. at 72.) He advised Plaintiff of her right to have the recommendation reviewed. (Id.; Rinker Dep. at 46.)

School Superintendent Charles Nagle ("Superintendent Nagle") reviewed the termination recommendations of both Porter and Jarrell. (First Aff. of Nagle ¶ 4.) He determined that Plaintiff slapped a special needs student in the back of the head, and that this conduct constituted appropriate grounds for termination. (Id. ¶ 5.) He informed the Board of his termination recommendation, and advised Plaintiff of her right to have the recommendation reviewed by the Columbia County Board of Education (the "Board"). (Nagle Dep. at 45-47.)

Plaintiff submitted a request to the Board to have them review the decision. Plaintiff also requested that the Board conduct a hearing on her appeal. (Rinker Dep. at 46-47.) Superintendent Nagle presented the Board members with a compilation of documents including materials relating to the investigation, correspondence confirming the termination recommendations of Porter and Jarrell, witness statements, and written materials submitted by Plaintiff regarding the appeal. (Nagle Dep. at 46-47.) The Board members reviewed these materials and voted to approve the termination recommendation. (Whitaker Aff. ¶¶ 6, 7, 10; Bridges Aff ¶¶ 6, 7, 10; Blackburn Aff. ¶¶ 6, 7, 10; Sleeper Aff. ¶¶ 6, 7, 10; Buccafusco Aff. ¶¶ 6, 7, 10.) They also voted to consider Plaintiff's appeal without granting her request for a hearing on the matter. (Id. ¶ 8.) They felt that a hearing was unnecessary because the information they received was sufficient to allow them to make a decision without a hearing. (Id.) The Board members terminated Plaintiff's employment because they determined that she slapped a special needs student and that this conduct violated both School District policy and Georgia law. (Id. ¶ 10.)

## B. Procedural History

On January 15, 2010, Plaintiff filed a complaint in the Superior Court of Columbia County alleging that Defendants violated her procedural and substantive due process rights by

9

terminating her employment as a bus driver.   (Doc. no. 1, Ex. A.)
Plaintiff sought a writ of mandamus to remedy the alleged illegal
conduct of Defendants.   Defendants subsequently removed this
action to federal court on the basis of federal question
jurisdiction.   (Doc. no. 1.)

After the case was removed to federal court, Plaintiff
amended her complaint to add two additional federal claims.
(Doc. no. 13.)   First, she alleged that the Board breached a 2007
Settlement Agreement by failing to provide her with an appeal
hearing prior to her termination.[1]   Second, Plaintiff alleged that
Defendants retaliated against union employees in violation of the
First and Fourteenth Amendments.

## II. SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no
genuine issue as to any material fact and . . . the moving party
is entitled to judgment as a matter of law."   Fed. R. Civ. P.
56(c).   Facts are "material" if they could affect the outcome of
the suit under the governing substantive law.   Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986).   The Court must view the
facts in the light most favorable to the non-moving party,
Matsushita, 475 U.S. at 587, and must draw "all justifiable

---

[1] See infra footnote 9.

inferences in [its] favor." Four Parcels, 941 F.2d at 1437 (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrate[ing]

11

that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk gave Plaintiff appropriate notice of the motion for summary judgment and informed her of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. no. 36.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are

satisfied. The time for filing materials in opposition has expired, and the motion is now ripe for consideration.

## III. **DISCUSSION**

### A. **Qualified Immunity**

The individual Defendants claim that they are entitled to qualified immunity on Plaintiff's freedom of association, equal protection, and due process claims brought pursuant to 42 U.S.C. § 1983. A government official who is sued under § 1983 may seek summary judgment on the ground that he is entitled to qualified immunity. Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1263 (11th Cir. 2004). It is well established that "[q]ualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

To be eligible for qualified immunity, the official must first establish that he was performing a "discretionary function" at the time the alleged violation of federal law occurred. Crosby v. Monroe Cnty., 394 F.3d 1328, 1331 (11th Cir. 2004). Once the official has established that he was engaged in a discretionary function, the burden shifts to the plaintiff to show that the

13

official is not entitled to qualified immunity.  Holloman, 370 F.3d at 1264.  The Supreme Court has set forth a two part test for the qualified immunity analysis.  "The threshold inquiry a court must undertake . . . is whether [the] plaintiff's allegations, if true establish a constitutional violation."  Hope v. Pelzer, 536 U.S. 730, 736 (2002) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  If no constitutional right would have been violated were the allegations established, it is unnecessary to continue the qualified immunity inquiry.  Saucier, 533 U.S. at 201.  "If a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.'"  Vinyard, 311 F.3d at 1346 (quoting Saucier, 533 U.S. at 201.)

In this case, Defendants were performing a "discretionary function" of their positions when they allegedly violated Plaintiff's constitutional rights, a fact that is not disputed by either party.  The burden therefore shifts to Plaintiff to show a violation of her constitutional rights.  See Hope, 536 U.S. at 736.  As discussed below, Plaintiff cannot establish a constitutional violation, and therefore, the individual Defendants are entitled to qualified immunity.[2]

---

[2] The Court recognizes that it is no longer bound to follow the two-step Saucier analysis for qualified immunity, but instead has flexibility to decide which of the two prongs should be addressed first in light of the circumstances in the particular case at hand.  See Pearson v. Callahan, 555 U.S. 223, 224-25

## B.   Claims Relating to Termination[3]

### 1.   Violation of the Right to Free Association

Plaintiff, by way of 42 U.S.C. § 1983, alleges that Defendants violated her First Amendment right of freedom of association.[4]   The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble and to petition the Government for a redress of grievances."   U.S. Const. amend. I.   Implicit in the right to engage in these First Amendment activities is a "corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."   Roberts v. United States Jaycees, 486 U.S. 609, 622 (1984).   To establish a claim under § 1983 for violating First Amendment rights, a plaintiff must show (1) a violation of a constitutional right, and (2) that the alleged violation was

---

(2009).  Under the facts of this case, it was more appropriate to first address the existence of a constitutional violation.

[3] Defendants dedicated a significant portion of their brief to the argument that the lack of a discriminatory animus on behalf of a "final policymaker" or "final decision maker" precludes recovery against any Defendant under § 1983.  However, because Plaintiff could not establish any claim under § 1983, the Court did not consider the policymaker analysis.

[4] Although Plaintiff's Complaint alleges a First Amendment violation generally, it does not appear that she is advancing a freedom of speech claim. Plaintiff asserts that she was terminated because of her participation in the union, not because of any particular speech associated with her union affiliation.  Thus, her claim arises from an alleged violation of her freedom of association rights, not her free speech rights.

committed by a person acting under color of state law. Holmes v. Crosby, 418 F.3d 1256, 1258 (11th Cir. 2005); Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001).

Public employees, including Plaintiff, are protected by the right to free association, and the First Amendment prohibits retaliation based on the expression of that right. Garcetti v. Ceballos, 547 U.S. 410, 417 (2006) ("The Court has made clear that public employees do not surrender all of their First Amendment rights by reason of their employment."); Smith v. Arkansas State Highway Emps., Local 1315, 441 U.S. 463, 465 (1979) ("The public employee surely can associate and speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so." (citing Pickering v. Bd. of Educ., 391 U.S. 563, 574-75 (1968))). The right to freely associate, however, is not unqualified. See Garcetti, 547 U.S. at 418 ("When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom.").

The framework for striking the appropriate balance between a public employee's First Amendment rights and the government's interest in efficiency was established in Pickering v. Board of Education, 391 U.S. 563 (1968). First, a plaintiff must prove that she was engaging in associative activity not in the course of her employment, but rather as a "citizen." D'Angelo v. Sch. Bd. of Polk Cnty., 497 F.3d 1203, 1212 (11th Cir. 2007). Here,

16

Plaintiff's union membership amounts to associative activity as a citizen. See Douglas v. Dekalb Cnty., No. 1:06-cv-484, 2007 WL 4373970, at *3 (citing Fuerst v. Clarke, 454 F.3d 770, 774 (7th Cir. 2006)). Once a plaintiff has met her burden on this threshold legal issue, a court must determine (1) whether an adverse action occurred, and (2) whether the constitutionally protected association was a substantial or motivating factor in the employment decision. Starling v. Bd. of Cnty. Comm'rs, 602 F.3d 1257, 1261 n. 1 (11th Cir. 2010); Hatcher v. Bd. of Pub. Educ., 809 F.2d 1546, 1558 (11th Cir. 1987). If the employee can meet this burden, the burden shifts to the employer to show that it would have made the same decision, even in the absence of the protected conduct. Douglas, 2007 WL 4373970, at *3.

Based on the evidence presented, there is no need to balance the Pickering factors because Plaintiff's union activity did not form the basis of the termination decision. See Douglas v. Dekalb Cnty., 308 Fed. Appx. 396, 399 n. 1 (11th Cir. 2009) ("Since we are persuaded the adverse employment actions were not motivated by protected union activity, we need not perform a Pickering balancing."); Shahar v. Bowers, 114 F.3d 1097, 1113 (11th Cir. 1997) ("Pickering balancing does not apply where the employee's constitutionally protected conduct did not motivate the employer's decision. In such a case, balancing is not necessary; the employer prevails because the employee has not established the

17

element of causation.") (Tjoflat, J. specially concurring). Although Plaintiff was a union member, she was terminated because she violated School District policy. Moreover, the record demonstrates that Plaintiff would have been terminated even in the absence of protected union activity.

Porter stated that he based his termination recommendation on the allegation that Plaintiff slapped a special needs student, an allegation that was corroborated by a teacher and a paraprofessional. (Porter Dep. at 78.) Moreover, Jarrell and Superintendent Nagle upheld the recommendation because they believed that intentionally striking a student was an appropriate ground for termination. (Nagle Aff. ¶ 5; Jarrell Dep. at 72.)

Although Plaintiff asserts that her termination was the result of a coordinated effort among School District representatives to retaliate against her due to union membership, Defendants need only advance one reason as to why they were justified in terminating Plaintiff and they have satisfied this requirement. Mt. Healthy v. Doyle, 429 U.S. 274, 286 (1977). The evidence presented to Porter, Jarrell, Superintendent Nagle, and the Board members suggested that Plaintiff struck a special needs student and that two eyewitnesses corroborated the event. This evidence of misconduct demonstrates that Plaintiff was terminated not because of union affiliation, but instead because she engaged in misconduct that was violative of Board policy.

Even if this Court were to balance the Pickering factors, Plaintiff is unable to demonstrate that her union affiliation played a substantial part in the termination decision because she did not present any evidence that Defendants were aware of her union activities. In order for Plaintiff to carry her burden on this issue, she must produce "more than a mere scintilla of evidence that [her union affiliation] played a substantial part in the decision not to keep her on as an [employee]." Bartes v. School Bd. of Alachua Cnty., No. 04-15459, 2005 WL 2764744, at *4 (11th Cir. 2005). Here Plaintiff has not met this burden. Porter explained that he does not oppose anyone's right to join a union and did not consider whether Plaintiff was affiliated with the union when formulating his termination recommendation. (Porter Dep. at 428, 467.) Plaintiff had no knowledge regarding whether Jarrell and Superintendent Nagle knew she was a union member at the time they upheld the recommendation to terminate her employment. (Rinker Dep. at 65-66.) Furthermore, no Board member was aware that Plaintiff was a union member. (Whitaker Aff. ¶ 11; Bridges Aff. ¶ 11; Blackburn Aff. ¶ 11; Sleeper Aff. ¶ 11; Buccafusco Aff. ¶ 11.) The Board members asserted that they did not consider union affiliation and voted in favor of termination after reviewing the materials presented to them which established that Plaintiff assaulted a special needs student in violation of School District policy and Georgia law. (Id. ¶ 10.) Porter,

19

Jarrell, Superintendent Nagle, and every member of the Board confirmed that they would have made the same decisions regardless of whether Plaintiff was a member of any union. (Porter Dep. at 467; Jarrell Dep. at 85; Nagle Dep. at 45; Whitaker Aff. ¶ 11; Bridges Aff. ¶ 11; Blackburn Aff. ¶ 11; Sleeper Aff. ¶ 11; Buccafusco Aff. ¶ 11.)  Plaintiff has offered no evidence, other than conjecture, to rebut this testimony.

Based upon the foregoing, the evidence establishes that Plaintiff was terminated because she struck a student and not because she belonged to the union.  There is simply no evidence that Defendants were aware of Plaintiff's union membership, and even if they were aware, there is nothing to suggest that Plaintiff's union activity played a substantial part in the termination decision.  Thus, Defendants' motion for summary judgment on Plaintiff's freedom of association claim is **GRANTED**.[5]

---

[5]  Plaintiff also argues that a "cat's paw theory" of liability should apply because the School Board approved Porter's termination recommendation without conducting an independent investigation.  The cat's paw theory allows a plaintiff to establish causation by showing that the decision maker followed a biased recommendation without independently investigating the complaint against the employee.  Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999).  In such a case, the recommender is using the decision maker as a mere conduit, or "cat's paw," to give effect to the recommender's discriminatory animus.  Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998).  Despite Plaintiff's claim to the contrary, the cat's paw theory is not applicable to the facts of the present case.  As noted above, Plaintiff failed to demonstrate that Porter knew of her union affiliation at the time he recommended termination, and thus cannot establish that Porter harbored a discriminatory animus.

To the extent that Porter may have based his termination decision on Plaintiff's union affiliation, there is no evidence that Jarrell, Superintendent Nagle, and the Board members acted as "mere conduits" for Porter's discriminatory animus.  Although these individuals considered Porter's recommendation, they made their employment decisions based on the totality of

## 2.   Violation of Equal Protection Rights[6]

Plaintiff asserts that her termination amounted to a violation of her equal protection rights. Specifically, Plaintiff claims that the Board upheld the termination recommendation because of her classification as a union member. The Equal Protection Clause prohibits a state from denying to "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XVI, § 1. The Clause embodies the principle that all similarly situated people should be treated alike. City of Cleburn v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). To establish her claim, Plaintiff must show that (1) she was treated differently from others who were similarly situated on the basis of her union activities, and (2) Defendants had no rational basis

---

the circumstances, including an independent review of the record. (Whitaker Aff. ¶ 7; Bridges Aff. ¶7; Blackburn Aff. ¶ 7; Sleeper Aff. ¶ 7; Buccafusco Aff. ¶ 7.)  Thus, there is no evidence that the Board members effectuated Porter's recommendation without conducting an independent review.

[6] Plaintiff did not specifically plead an Equal Protection violation in her amended complaint. Instead, the amended complaint raises a breach of contract claim, a due process claim, and a First Amendment claim. Under established Eleventh Circuit precedent, the non-moving party may not assert new claims at the summary judgment stage. Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314 (11th Cir. 2004). "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." Id. at 1315.

The Court, however, addresses the Equal Protection claim because of its close connection with Plaintiff's Freedom of Association claim. In her amended complaint, Plaintiff alleges that Defendants took "retaliatory actions against" members of the union. (Doc. no. 13 at ¶ 9.) As evidence of retaliation Plaintiff alleges that union employees were subject to "selective enforcement of work rules, selective implementation of disciplinary actions, undue scrutiny . . ., and selective granting of employment benefits." (Id. at ¶ 10.) These allegations suggest the basis of Plaintiff's retaliation claim was the differential treatment of union members as compared to non-union members. Thus, the Court considered both an Equal Protection claim and a First Amendment claim.

for the alleged dissimilar treatment.   Smith v. Atlanta Indep. Sch. Dist., 633 F. Supp. 2d 1364, 1381 (N.D. Ga. 2009) (citing Cleburn, 473 U.S. at 439-42).   The state action must be "irrational and wholly arbitrary" in order to trigger equal protection concerns.   Village of Willowbrook v. Olech, 528 U.S. 562, 565 (2000).

The Eleventh Circuit has held that when an employee alleges discriminatory discipline, to determine whether employees are similarly situated, "it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."   Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999) (internal citations omitted).[7]   "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed."   Id.   The quantity and quality of the comparator's misconduct must be nearly identical to prevent courts from second-guessing employers' reasonable decisions.   Id.

Plaintiff identifies non-union employees who she believes engaged in conduct that was similar to hers, but who received less severe punishments.   She points to two specific individuals: Ms.

---

[7]   The Court is cognizant of the fact that the plaintiff in Maniccia claimed that her termination violated Title VII and that she did not assert an Equal Protection claim pursuant to § 1983. Despite the difference in the claim asserted, the similarly situated standard of Maniccia is applicable in the Equal Protection context.   Other courts have applied a similar analysis when determining whether employees were similarly situated for Equal Protection purposes.   See Catlett v. Peters, No. 98-CV-3273, 1999 WL 1269196, at *7-8 (N.D. Ill. Dec. 23, 1999); Grady v. City of Orlando, No. 96-CV-1295, 1998 WL 657663, at *3-4 (M.D. Fla. June 25, 1998).

22

Johnson and Ms. Carlos.  Ms. Johnson was a non-union bus aide who was accused of abusing a special needs student on her bus. According to the bus driver on Ms. Johnson's bus, after the child refused to sit quietly, Ms. Johnson sat next to him and shoved him hard against the window.  When she could not get the boy under control, Ms. Johnson was accused of putting him in a headlock. Porter conducted an investigation and interviewed Ms. Johnson, as well as the driver who made the allegations and teachers from the school that she served.  (Porter Dep. at 308.)  Ms. Johnson denied putting the student in a headlock.  (Id. at 314.)  The teachers at the school stated that when dealing with this particular student, Ms. Johnson had to sit close to him to make him feel more comfortable and prohibit him from harming other children.  (Id.) They also complimented Ms. Johnson's ability to handle students with severe behavioral and emotional issues.  (Id. at 311.) Porter did not discipline Ms. Johnson because he did not find any evidence suggesting that she acted inappropriately.  (Id. at 309.)

Ms. Carlos was a non-union bus aide accused of striking a special needs student twice on the buttocks.  A lunch room supervisor provided a statement supporting the allegations. (Hobbs Aff. ¶ 9.)  The Columbia County Sheriff's Department investigated the incident and found that there was insufficient evidence to move forward with a case against Ms. Carlos.  (Porter Dep. at 42-43.)  Porter did not pursue discipline because he did

not find any evidence that she intentionally struck the student. (Id. at 42.)

While Plaintiff arguably presented evidence of similarly situated employees who suffered less severe punishments, she has failed to present evidence that the differential treatment was irrational or arbitrary. Plaintiff merely argues that the termination of union employees demonstrates a pattern of discrimination against union members. She has not established that her termination was the result of intentionally disparate treatment, and thus Defendants' motion for summary judgment on Plaintiff's equal protection claim is **GRANTED**.

## C. Claims Relating to Termination Procedures

### 1. Violation of Settlement Agreement[8]

Plaintiff asserts that the Board's failure to grant her request for an appeal hearing amounted to a violation of the 2007 Settlement Agreement ("Settlement Agreement"). The Settlement Agreement at issue was the result of a prior lawsuit between members of Plaintiff's union and the School District.[9] Plaintiff's

---

[8] Plaintiff's breach of contract claim is pursued only against the Board, and not against any individual Defendant. (Joint Stipulations ¶ 7.)

[9] In the prior suit, members of the Transport Workers Union of America, AFL-CIO, and Transport Workers Union Local Union No. 279 filed suit against the Columbia County School District and the members of the Columbia County Board of Education in the United States District Court for the Southern District of Georgia, Augusta Division. The plaintiffs alleged that they were denied the opportunity to speak about certain matters and that they were discriminated against based on their union affiliation. In an effort to mutually resolve the issues without a Court proceeding, the parties agreed to the terms of the Settlement Agreement.

claim that the Board violated the Settlement Agreement appears to be twofold.   First, the Settlement Agreement stated that School Board counsel would provide an "expanded grievance policy." Plaintiff, however, argues that the Board restricted the grievance procedures instead of expanding them.   Second, Plaintiff contends that the Board's failure to provide her a direct appeal and a hearing amounted to a violation of the Settlement Agreement.

In order to understand Plaintiff's contentions, it is necessary to distinguish between the two types of School District employees: certified personnel and classified at-will personnel. (Nagle Dep. at 28-29.)   Certified employees include teachers, administrators, and certified educators. (Id. at 28.)   They hold advanced degrees in education or possess other state certifications. (Id.)   Classified at-will employees are non-certified staff including custodians, bus drivers, secretaries, paraprofessionals, and nutrition employees. (Id.)   Pursuant to O.C.G.A. § 20-2-211, all certified professional personnel must be issued an annual contract.   Classified at-will employees, on the other hand, are not entitled to a contract of employment and are at-will employees.   Plaintiff was a classified at-will employee as evidenced by the fact that she was hired for an indefinite period of time and worked without a contract of employment. (Rinker Dep. at 22.)

25

The School District maintains separate and distinct policies and procedures for certified and classified at-will employees. The policy and procedures applicable to Complaints and Grievances of *certified employees* are coded "GAE." The policy and procedures applicable to the suspension and termination of *classified at-will personnel* are coded "GCK." For ease of reference, the Court will refer to the two categories of employees henceforth as either certified or classified at-will employees, Plaintiff falling into the latter category.

### a.   Policy GAE Does not Apply to Plaintiff

Under the terms of the Settlement Agreement, the Board stated that it would expand the grievance procedures for classified at-will employees. The pertinent provision of the Settlement Agreement is as follows:

> In the best interest of all parties and all employees, School Board Counsel will draft an expanded grievance policy (GAE-1)[10] for all classified employees, including employees of the Transportation Department. Pursuant to this expanded policy, classified employees with at least 24 months of continuous service with the Board of Education can appeal to the Board of Education or its Personnel Committee any recommendation to terminate such employee(s) before final action to terminate is taken by the Board. The Administration will continue implementing procedures on due process. The Administration will prepare procedures to define process.

(Doc. no. 39 at 9.)

---

[10] The policy that applies to classified at-will employees is actually policy "GCK." The policy was erroneously identified as "GAE1" in the Settlement Agreement. "GAE1" applies to certified employees, and "GCK" applies to at-will, "classified" employees. (Nagel Aff. ¶ 14.)

Prior to the Settlement Agreement, Policy GAE (applicable to certified employees) provided that "when hearing an appeal from a prior level, the local Board of Education shall hear and decide all appeals de novo." (Hobbs Aff., Ex. A.) In promising to expand the grievance policy for classified at-will employees, the Board revised Policy GCK (applicable to classified at-will employees) to provide: "Upon good cause the Board may grant such employees the opportunity of an appeal hearing." (Pl.'s Ex. 44.) Plaintiff's first claim with respect to the Settlement Agreement is that the Board did not provide an "expanded grievance policy." Instead, Plaintiff contends that the implementation of the revised Policy GCK restricted the rights available under Policy GAE because classified at-will employees are no longer entitled to an automatic appeal hearing. Stated differently, Plaintiff contends that the revised version of Policy GCK restricts the appeal rights available under Policy GAE such that the Board failed to provide for an "expanded grievance policy" as set forth in the Settlement Agreement.

At the outset, the Court recognizes that Plaintiff's contention presupposes that she was subject to Policy GAE. She was not. In reviewing Policy GAE, the Court notes that it clearly applies only to certified personnel. Not only does Policy GAE reference "certified" employees, but the purpose of the policy is to implement the provisions of O.C.G.A. § 20-2-989.5. (Hobbs

27

Aff., Ex. A.) Subpart (b) of O.C.G.A. § 20-2-989.5 states that it is the duty of local school administrations to "adopt a complaints policy for *certified personnel*." (emphasis added). Second, "termination, non-renewal, demotion, suspension, or reprimand of an employee" are specifically excluded from Policy GAE. Board policies and procedures relating to termination or suspension of *certified* employees carry the descriptive code "GBN." Thus, Policy GAE does not apply to Plaintiff who is a *classified at-will employee* seeking a review of a *termination decision*.

The only policy that is relevant to Plaintiff is Policy GCK, which explicitly references classified at-will employees seeking reviews of termination decisions. Therefore, to the extent that Plaintiff's argument challenges Policy GCK because it restricted Policy GAE in violation of the Settlement Agreement, that argument must fail because Policy GAE and the rights attendant to it are wholly irrelevant to Plaintiff's case.

### b. Policy GCK Expanded the Grievance Procedure As Required by the Settlement Agreement

The Court must next consider whether Policy GCK expanded the grievance procedures available to classified at-will employees in accordance with the Settlement Agreement. Based upon a comparison between the version of Policy GCK in place before the Settlement Agreement and the version revised after the Settlement Agreement, it appears that the Board provided an "expanded grievance policy."

28

Pursuant to the Settlement Agreement, certain classified at-will employees could appeal a termination recommendation before final action was taken. Further, the Columbia County School Administration agreed to implement procedures on due process. The Board complied with both provisions of the Settlement Agreement.

First, under the revised version of Policy GCK, classified at-will employees who maintain continuous employment for a minimum of twenty-four (24) months are afforded the right to have their termination recommendations reviewed. Unlike the version of Policy GCK in place before the Settlement Agreement, the revised version of Policy GCK provides an employee the opportunity to apply for an appeal hearing. Second, the Board implemented new procedures relating to due process, which is called "Procedure GCK." Procedure GCK describes in detail the process an employee must follow in order to have a termination recommendation reviewed by the Board. Procedure GCK also describes the appeal hearing process should the Board decide to grant a hearing. Therefore, the Board complied with the Settlement Agreement because it expanded the grievance policy for classified at-will employees and implemented Procedure GCK.

      c.   **The Board Complied with the Provisions of Policy GCK and Procedure GCK**

Plaintiff next contends that the Board breached the Settlement Agreement by denying her the opportunity to appeal

29

directly to the Board.   In order to resolve this issue, the Court must determine whether the Board complied with the provisions of Policy GCK and Procedure GCK.     Pursuant to Policy GCK and Procedure GCK, after a review by the Assistant Superintendent and Superintendent Nagle, the employee has the right to have the termination recommendation reviewed by the Board.   Pl.'s Exs. 44, 45.)

Here, Plaintiff sought review of her termination decision. She wrote a statement to the Board explaining her side of the story.   (Rinker Dep. at 69.)   This statement was submitted to the Board along with other written materials related to the termination recommendation.   (Whitaker Aff. ¶ 6; Bridges Aff. ¶ 6; Blackburn Aff. ¶ 6; Sleeper Aff. ¶ 6; Buccafusco Aff. ¶ 6.)     The Board reviewed those materials and decided to uphold the termination recommendation. (Id. ¶ 10.)   Therefore, Plaintiff was provided the opportunity to have her case reviewed by the Board.

In regard to the argument that Plaintiff was entitled to a hearing before the Board under the terms of the Settlement Agreement, this claim must also fail.   The Board complied with Policy GCK and Procedure GCK when it determined that an appeal hearing was unnecessary.   Nothing in Policy GCK or Procedure GCK provides for an unqualified right to a hearing.   While Policy GCK and Procedure GCK allow classified at-will employees a right to appeal a termination recommendation, the Board reserves the right

to determine whether to conduct hearings on those appeals. (Whitaker Aff. ¶ 16; Bridges Aff. ¶ 16; Blackburn Aff. ¶ 16; Sleeper Aff. ¶ 16; Buccafusco Aff. ¶ 16.) Policy GCK states that "*upon good cause*, the Board *may* grant such employees the opportunity of an appeal hearing." (Doc. no. 64, Ex. 14) (emphasis added).

Moreover, counsel for the School District who negotiated the Settlement Agreement confirmed that, during the negotiations between the parties, the union demanded that certain classified at-will employees be granted the right to a hearing before the Board in connection with all termination recommendations by the School Superintendent. (Fletcher Aff. ¶ 4.) The Board, however, rejected this request. (Id. ¶ 5.)

Therefore, under the terms of the final Settlement Agreement, the Board reserved the right to determine, on a case- by-case basis, whether to conduct evidentiary hearings on termination recommendations for classified at-will employees. (Id. ¶ 6.) Plaintiff applied for a hearing, and the Board considered her request. (Whitaker Aff. ¶ 5; Bridges Aff. ¶ 5; Blackburn Aff. ¶ 5; Sleeper Aff. ¶ 5; Buccafusco Aff. ¶ 5.) The Board, however, voted to deny Plaintiff's request because they determined that the grounds for the termination recommendation were sufficiently presented to them in written materials, and thus there was no need for a hearing. (Id. at ¶ 8.) Because Plaintiff was not entitled

to an automatic appeal hearing, the Board did not violate the Settlement Agreement in failing to grant her request. Thus Defendants' motion for summary judgment on Plaintiff's breach of contract claim is **GRANTED.**

### 2. 42 U.S.C. § 1983 Denial of Procedural Due Process

Plaintiff next claims that her termination amounted to a violation of procedural due process, and she seeks relief pursuant to § 1983. In order to establish a procedural due process violation under § 1983, a plaintiff must show: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003). Even if Plaintiff alleges and satisfies these elements, she cannot state a federal procedural due process claim if adequate state remedies are available to her. McKinney v. Pate, 20 F.3d 1550, 1562-64 (11th Cir. 1994).

The Fourteenth Amendment protects against the government's deprivation of liberty or property without procedural due process. Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 569 (1972). State law determines whether a public employee has a property interest in his or her job. Bishop v. Wood, 426 U.S. 341, 344 (1976); Barnett v. Housing Auth. of Atlanta, 707 F.2d 1571, 1576 (11th Cir. 1983) (overruled on other grounds). A constitutionally protected property interest is created if there

32

are "rules of mutually explicit understandings that support [a] claim of entitlement." Perry v. Sindermann, 408 U.S, 593, 601 (1972). "To obtain a protected property interest in employment, a person must have more than a mere unilateral expectation of continued employment; one must have a legitimate claim of entitlement to continued employment." Warren v. Crawford, 927 F.3d 559, 562 (11th Cir. 1991). Thus, to evaluate the validity of Plaintiff's procedural due process claim, the Court must first determine whether she had a protected property interest in her employment as a bus driver with the School District.

Under Georgia law, in the absence of a controlling contract between the parties, employment for an indefinite period of time is terminable at will by either party. Land v. Delta Air Lines, 130 Ga. App. 231 (1973); see also O.C.G.A. § 34-7-1. Moreover, a public employee generally has no property right in such employment. Ogletree v. Chester, 682 F.2d 1366, 1369 (11th Cir. 1982) (citing Barnes v. Mendonsa, 110 Ga. App. 464 (1964)). However, a public employee has a property interest in his job if his employment allows dismissal only for cause. Warren, 927 F.3d at 562. An explicit contractual provision, rules, or common understanding may determine whether an employee is terminable at will or only for cause. DeClue v. City of Clayton, 246 Ga. App. 487, 489 (2000). The expectations of the parties involved are

also relevant to this issue. Maxwell v. Mayor & Aldermen of Savannah, 226 Ga. App. 705, 707 (1997).

Plaintiff contends that Policy GCK provided her with a protected property interest. Policy GCK states that the Superintendent can terminate, pending Board approval, "any auxiliary employee who fails to comply with employment expectations and rules, who fails to perform assigned duties, *or for any other good and sufficient cause.*" (Pl.'s Ex. 44) (emphasis added). Plaintiff asserts that, based on this language, she could only be terminated for cause, and thus she had an expectation of continued employment sufficient to bestow a protectable property interest.

Policy GCK further provides "nothing in this policy shall grant the right to continued employment or change the legal status of at-will employees." (Id.) Procedure GCK contains a similar disclaimer and states that the procedure is merely designed "to give auxiliary employees a fair means to have terminations . . . informally reviewed." (Pl.'s Ex. 45.) Defendants contend that this disclaimer demonstrates that Plaintiff remained an at-will employee and that the School District did not intend to expand the rights of classified at-will employees.

Despite Plaintiff's claim to the contrary, Policy GCK does not grant her a property interest in continued employment because the Superintendent has broad discretion to recommend termination.

Although Policy GCK contains "for cause" language, it does not
provide that Plaintiff could *only* be terminated for cause.   Cf.
Glenn v. Newman, 614 F.2d 467, 472 (5th Cir. 1980) (finding that
provision allowing suspension only "for cause" created a property
interest).[11]    Policy GCK states that the Superintendent may
terminate, pending Board approval, "any employee who fails to
comply with employment expectations and rules, who fails to
perform assigned duties, or for any other good and sufficient
cause." (Pl.'s Ex. 44.)   The Columbia County Auxiliary Employment
Handbook provides a list of ten (10) specific expectations for
School District employees. (Pl.'s Ex. 43.)   However, the Handbook
also states that the guidelines are offered to insure that
employees understand expectations for job performance and that
they are "not intended to be all-inclusive" because "other
specific expectations exist for all positions." (Id.)   The fact
that the Superintendent could terminate an employee for violating
an employment expectation not expressly listed in the Handbook or
in Policy GCK demonstrates that he could terminate for reasons
other than "good cause." See Warren, 927 F.2d at 563 (finding no
property interest because employees could be dismissed at the
discretion of the administrator); Georgia Ports Auth. v. Rogers,
173 Ga. App. 538, 539 (1985) (finding no property interest when

---

[11] See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir.
1981) (holding Fifth Circuit decisions made on or before September 30, 1981, are
binding precedent in Eleventh Circuit).

35

policy manual's list of reasons for termination indicated that it was not exclusive of other possible reasons). Thus, despite the "for cause" language, Policy GCK places no limit on the Superintendent's ability to determine whether an employee complied with employment expectations and recommend termination based on that decision. See Edwards v. Brown, 699 F.2d 1073, 1076-77 (11th Cir. 1983) (finding no property interest because ordinance placed no limit on the commissioner's discretion to determine whether an employee had fulfilled the standards of "good behavior and efficient service").

Moreover, even if the "for cause" language limited the Superintendent's ability to recommend termination, that limitation applies only to the Superintendent and not to the Board. Both Eleventh Circuit and Georgia case law recognize that, under certain circumstances, policies and personnel manuals which include language that an employee may only be terminated "for cause" grant the employee a property interest in continued employment. See Brown v. Ga. Dep't of Revenue, 881 F.2d 1018, 1024-25 (11th Cir. 1989) (finding state granted a property interest by providing that permanent status employees may not be fired except in accordance with the Personnel Board rules); Barnett, 707 F.2d at 1576-77 (noting the personnel policy permitted involuntary discharge only "for cause," which limited the power of the appointing body to dismiss and created a property

interest in continued employment); Brownlee v. Williams, 233 Ga. 548, 550-51 (1975)(finding statute that stated that the appointing authority could only dismiss for cause created a property interest in continued employment); DeClue, 246 Ga. App. at 489-90 (holding policy that allowed disciplinary action against employees only for certain specified reasons was evidence that the employee had a property interest in continued employment).

However, Policy GCK is distinguishable from the policies in the above-cited cases. In those cases, the employees had property interests because the "for cause" language curtailed the *employer's* right to terminate in a substantial way. See Brown, 881 F.2d at 1027 (the "for cause" language suggested that there was some substantive limitation on the state's ability to terminate covered employees); Barnett, 707 F.2d 1576-77 ("We conclude that, by limiting the power of the appointing body to dismiss an employee, these regulations confer on [the plaintiff] a valid property interest in continued employment."); see also Dethrow v. Parkland Health Hosp. Sys., No. 3:00-cv-2126, 2002 WL 413905, at *5 (N.D. Tex. March 11, 2002) (finding that in order for an employment policy to alter the at-will nature of employment, "the policy must specifically and expressly limit the *employer's* ability to terminate the employee" (emphasis added)). Under the facts of this case, the Board has the authority to terminate, not the Superintendent. Pursuant to Policy GCK, the

37

Superintendent can *only* recommend termination; the recommendation, however, is subject to Board approval. Moreover, Superintendent Nagle stated that he does not have unilateral authority to terminate any employee, and that this authority rests solely with the Board.   (Nagle Dep. at 44.)   Thus, unlike the above-cited cases, nothing in Policy GCK limits the Board's (the employer) right to terminate.   Because the "for cause" language does not apply to the Board, it does not create a protectable property interest.

Interpreting the "for cause" language as applying only to the Superintendent's termination authority is consistent with the disclaimer that the policy was not meant to transform the status of at-will employees.   The disclaimer affirms the Board's intent that Policy GCK does not alter its legal relationship with classified at-will employees.   Therefore, despite the apparent contradiction between the "good cause" language and the disclaimer, the two are reconcilable.   The "good cause" language applies only to the Superintendent, while the disclaimer demonstrates that the "good cause" language was not meant to affect the relationship between the Board (the employer) and classified at-will employees.   Therefore, Defendants' motion for summary judgment on Plaintiff's procedural due process claim is **GRANTED**.

### 3. 42 U.S.C. § 1983 Denial of Substantive Due Process

Plaintiff also asserts that Defendants terminated her employment in violation of her substantive due process rights. However, the protection of substantive due process does not apply in the employment law context.   Instead, the substantive due process protections of the United States Constitution extend only to certain fundamental rights so "implicit in the concept of ordered liberty" that "no amount of process can justify [their] infringement." Gibson v. City of Gadsden, 377 Fed. Appx. 953, 956 (11th Cir. 2010) (quoting McKinney, 20 F.3d at 1556-57); White v. Hall, 389 Fed. Appx. 956, 959 (11th Cir. 2010).   "Because employment rights are state-created rights and are not 'fundamental' rights created by the Constitution, they do not enjoy substantive due process protection." Gibson, 377 Fed. Appx. at 956.   Thus, Defendants' motion for summary judgment on Plaintiff's substantive due process claim is **GRANTED**.[12]

---

[12] It appears from the parties' briefs that Plaintiff also claims that the denial of a hearing amounted to a violation of her Equal Protection rights. Because Plaintiff failed to present any evidence of similarly situated non-union employees who received a hearing, Plaintiff's claim must necessarily fail.

## IV. <u>CONCLUSION</u>

Upon the foregoing, Defendants' Motion for Summary Judgment (Doc. no. 32) is **GRANTED**. The Clerk is directed to **ENTER JUDGMENT** in favor of Defendants and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia this $29\frac{th}{}$ day of March, 2012.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA